# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

DANOS & CUROLE MARINE CONTRACTORS, INC., §
　§
    *Plaintiff,* §
　§
v. §     CIVIL ACTION H-13-3803
　§
BP AMERICA PRODUCTION COMPANY, §
　§
    *Defendant.* §

## AMENDED MEMORANDUM OPINION & ORDER[1]

Pending before the court is plaintiff Danos & Curole Contractors LLC's ("Danos") motion for partial summary judgment (Dkt. 20), and defendant BP America Production Company's ("BP") cross motion for summary judgment (Dkt. 22). Upon consideration of the motion, responses, and applicable law, Danos' motion (Dkt. 20) is GRANTED and BP's motion (Dkt. 22) is DENIED.

## I. BACKGROUND

Danos provides operations and maintenance labor services for BP on a platform in the Gulf of Mexico called "Marlin." Dkt. 20-1 at 2–3. The platform is located on the Outer Continental Shelf ("OCS") in Viosca Knoll Block 915, an area located near the coasts of Louisiana and Alabama. To manage the working relationship, Danos and BP entered a master service contract ("MSC"). In the MSC, Danos and BP agreed to indemnify the other for the injuries of their own employees. *Id.* at 3; Ex. 3 at 9–13.

The present litigation is an offshoot of litigation pending in the Eastern District of Louisiana involving Danos and BP.[2] In that case, BP's employee Charles Crawford ("Crawford") was

---

[1] Due to a typographical error in the court's Memorandum Opinion & Order (Dkt. 32), the court hereby substitutes this Amended Memorandum Opinion & Order in its place.

[2] *Crawford v. BP Corp. NA, et al.*, No. 2:13-cv-00445-JCZ-KWR (E.D. La.).

allegedly injured aboard the Marlin by one of Danos's employees. *Id.* Crawford filed suit against both Danos and BP to recover damages. *Id.* Subsequently, Danos filed a cross claim (Dkt. 1) against BP, seeking to enforce the indemnity provision in the MSC against BP with respect to Crawford's claims against Danos. *Id.* at 4; Dkt. 1. BP moved to dismiss the cross claim. Dkt. 2. The court denied the motion to dismiss and transferred the claim to this court, pursuant to a forum selection clause in the MSC. Dkt. 10.

In this court, Danos filed a motion for partial summary judgment (Dkt. 20) seeking a determination that the defense and indemnity provisions of the MSC are enforceable against BP. Dkt. 20-1. As part of its motion, Danos seeks a determination that Alabama is the "adjacent state" to the Marlin under the Outer Continental Shelf Lands Act ("OCSLA"), therefore, Alabama law applies where there are gaps in federal law. Dkt. 20-1. BP responded (Dkt. 21) that under OCSLA, Louisiana is the "adjacent state." Therefore, Louisiana law applies and renders the indemnity provisions unenforceable under the Louisiana Oilfield Indemnity Act. Dkt. 21 at 1. BP also filed a cross motion for summary judgment (Dkt. 22), which seeks a determination that Louisianan law applies, and incorporates its arguments from its response (Dkt. 21) to Danos' motion. Danos responded (Dkt. 24) to BP's cross motion by incorporating its arguments from its own motion for partial summary judgment (Dkt. 20). Both motions have been responded to and are ripe for discussion.

## II. LAW

### A. Summary Judgement Standard

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56©; *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett* , 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.* at 322. Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* If the nonmoving party does not respond, or address or support all facts alleged by the moving party, the court may consider the facts undisputed and grant summary judgment if the movant is entitled to it. FED. R. CIV. P. 56(e).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). In reviewing the evidence in the record, the court does not make credibility determinations or weigh any evidence. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). The court disregards all evidence favorable to the moving party that the jury is not required to believe. *Id.* Finally, it gives credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Id.* However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Additionally, the first issue before the court involves a determination of what law applies. A determination of which state is "adjacent" to the Marlin under OCSLA, and therefore which state's

law applies to the case, is a question of law. *See Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 523 (5th Cir. 2000) (reviewing whether district court's state adjacency analysis under OCSLA was correct as a matter of law). In this case, because a choice of law determination is a question of law, the traditional standard for summary judgment does not apply. *Vargas v. Kiewit Louisiana Co.*, No. H-09-2521, 2012 WL 1029517, at *2 (S.D. Tex. Mar. 26, 2012) (Ellison, K.) (citing *Nunez v. Hunter Fan Co.*, 920 F. Supp. 716, 717–18 (S.D. Tex. 1996)). Instead, the facts on which choice of law depends are properly determined by the Court after considering the affidavits, depositions, and other matters submitted by the parties. *Id.* (internal citations omitted).

### B. OCSLA

OCSLA grants jurisdiction to the United States "over the soil and seabed of the oceans and artificial islands and fixed structures located thereon, and grants to the United States the mineral resources that are part of the OCS." *Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521, 522 (5th Cir. 2000). Federal law governs actions brought under OCSLA, unless there is a gap in the federal law, wherein "the law of the adjacent state" will be used as "surrogate federal law."[3] *Bartholomew v. CNG Prod. Co.*, 862 F.2d 555, 557 (5th Cir. 1989). This Congressionally mandated choice of law provision trumps any contrary contractual provisions. *Snyder*, 208 F.3d 521 at 524. The Act goes

---

[3] The portion of OCSLA relevant to this case provides:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, **the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.** All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the outer Continental Shelf.

43 U.S.C. § 1333(a)(2)(A)) (emphasis added).

on to state that "the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area."[4] 43 U.S.C. § 1333(a)(2)(A) (hereinafter referred to as "§1333(a)(2)(A)").

In the absence of the Presidential determination, the Fifth Circuit has determined an "adjacent state" by considering four factors: 1) geographic proximity; 2) which coast federal agencies consider the subject platform to be "off of"; 3) prior court determinations; and 4) projected boundaries. *Snyder*, 208 F.3d at 524–25. This is not a strict four-factor test, but instead four categories of relevant evidence for courts to consider. *Id.* at 525. If "parties present evidence on only one factor, that factor is controlling." *Id.* at 524. But when courts are presented with more than one type of evidence, a single factor is not controlling. *Id.*

### C. Alabama's Law on Indemnity Provisions[5]

Alabama law generally construes contracts as they are written. *Holcim (US), Inc. v. Ohio Cas. Ins.*, 38 So. 3d 722, 728 (Ala. 2009). Alabama has long enforced indemnity agreements, even those that indemnify for another's negligence. *Id.* at 728. However, to be enforceable, some parameters must be met. The parties must enter the agreement knowingly and for valid consideration. *Id.* at 727. An indemnity provision to indemnify another's wrongs, such as negligence, must be expressed clearly and unequivocally. *Id.* Further, the contract must be fair in that the indemnitee cannot possess disproportionate bargaining power. *Id.*

---

[4] The parties dispute whether the President has published these projected lines, which is the subject of Section III.A. Dkt. 21 at 4; Dkt. 23 at 2–3.

[5] The court concludes that Alabama is the adjacent state to the Marlin, and therefore any gaps in federal law will be filled by Alabama law, as Danos contends. Therefore, the court need only utilize Alabama's position on indemnity provisions.

### III. WHAT STATE IS ADJACENT TO THE PLATFORM?

At the outset, the parties agree on several things. Because the accident occurred in the OCS, the parties agree that the controversy is governed by OCSLA. Dkt. 20-1 at 5; Dkt 21 at 1. The parties also agree that OCSLA adopts the law of the adjacent state as "surrogate federal law" when there are gaps in federal law. Dkt. 21 at 1; Dkt. 20-1 at 5. Plaintiff's position is that the adjacent state is Alabama, and under Alabama state law, the MSC indemnity provision is valid and enforceable against the defendant. Dkt. 20-1 at 5. Defendant's position is the adjacent state law is Louisiana, and under the Louisiana Oilfield Indemnity Act, the applicable MSC indemnity provision is void. Dkt. 21 at 1. Therefore, the first issue before the court is what state is the "adjacent state" to the Marlin under OCSLA, a question of law for the court to determine.

### A. Has the President spoken on the issue?

BP claims the President has established a boundary for the purposes of § 1333(a)(2)(A) through the Minerals Management Service (MMS),[6] which makes Louisiana the adjacent state to the Marlin. Dkt. 21 at 4. It is BP's position that because the President has made this determination, analysis of what state is the adjacent state under the *Snyder* factors is unnecessary. *Id.* Further, BP argues that the Fifth Circuit has already determined that the MMS boundaries control *Id.* Danos argues that the President has not made a determination of boundaries under § 1333(a)(2)(A) through MMS or otherwise. Dkt. 23 at 4. Therefore, the *Snyder* test still applies and MMS's boundary determinations are no more relevant than another agency's determination. *Id.*

### 1. Did the Fifth Circuit speak to this issue?

Before looking at the larger question of whether MMS's 2006 boundaries equate to the

---

[6] Both parties cite evidence from the MMS, which undisputedly has been succeeded by the Bureau of Ocean Energy Management ("BOEM"). *See* Dkt. 20-1 at 11; Dkt. 21 at 12.

President publishing boundaries under § 1333(a)(2)(A), the court first addresses whether the Fifth Circuit has provided guidance on this point. BP argues that, in *Snyder*, the Fifth Circuit said that there was no dispute that MMS could issue official projections under § 1333(a)(2)(A). Dkt. 21 at 9. BP argues that the Fifth Circuit's recognition of MMS's ability to issue projections under § 1333(a)(2)(A) provides sufficient jurisprudential grounds for this court to hold that the 2006 MMS boundaries control in this case. Dkt. 25 at 3.

Danos responds that the *Snyder* court did not hold that the MMS had authority to issue official projections under OCSLA. Dkt. 23 at 4. The court only noted that the *parties* had agreed that if the MMS had issued projections, which at the time it had not, those MMS projections would control. *Id.*; *Snyder*, 208 F.3d at 525 ("The parties agree that MMS would have authority to issue official projections under § 1332(a)(2)(A)"). The court continued: "until such official projections are published . . . some agency's determination 'pursuant' to that section is no more relevant than an agency's adjacency determination for some other purpose." Dkt. 23 at 4; *Snyder*, 208 F.3d 525.

The court finds that the Fifth Circuit in *Snyder* did not hold that if MMS ever published projections of state boundaries that they would automatically serve as the President's projections under § 1333(a)(2)(A). *Snyder*, 208 F.3d 524–25. The court merely noted, in response to the agreement between the parties that "if [MMS] did so, the determination . . .would be a relatively simple matter . . . not requiring the [four factor] approach." *Id.* at 525. On its face, all the court concludes is that if the MMS actually had the authority to issue the projections, as the parties believed they would have, the analysis would be easy. *Id.* The court did not hold or even find that MMS had authority to issue the official projections under § 1333(a)(2)(A). *Id.* The court certainly did not say that any boundaries created by MMS, whether created pursuant to OCSLA or not, automatically serve as the President's determination under § 1333(a)(2)(A). *Id.* What the court did

explicitly say is that until official projections are published, an agency's boundaries developed even "pursuant" to § 1333(a)(2)(A), do not control. Therefore, BP's argument that the Fifth Circuit has already determined this issue is unavailing. *Id.*

*2. Did the MMS publication equate to the President speaking on the issue?*

BP argues that the President has already established boundaries under § 1333(a)(2)(A) through the MMS. Dkt. 21 at 2. In 2006, the MMS published in the Federal Register boundaries for each coastal state that extend seaward to the OCS for the Gulf, Atlantic, and Pacific coasts. *Id.* BP argues that the detailed notice, including maps of draft boundaries, as well as the final administrative boundary determinations, all show that Viosca Knoll 915 is adjacent to Louisiana. Dkt. 21 at Ex. 1. BP also points to Danos' Exhibit 17 which shows the MMS boundaries plotted on top of the Viosca Knoll Blocks to show that Viosca Knoll Block 915, the location of the Marlin, is adjacent to Louisiana. *Id.*; Dkt. 20-1 at 17.

To support its argument that MMS spoke for the President, BP explains that the MMS is an agency of the Department of the Interior, which is a department within the Executive Branch under the direct control of the President. Dkt. 21 at 5. Further, BP argues that the President spoke through the MMS because it utilized the principle of equidistance. *Id.* at 7. BP explains that this is important because equidistance is used often, and in 1970, the President appointed a committee that directed all agencies to use equidistance when dealing with coastal states. *Id.* at 7. Finally, BP explains that BOEM, the successor to MMS, has adopted the same boundaries. *Id.* at 8.

Danos responds that the MMS's 2006 boundary determinations do not equate to the President's determination. Specifically, the authority to project state boundaries under OCSLA belongs to the President, who has not made official projections, nor has he clearly delegated this authority to the MMS. Dkt. 23 at 1, 4. Danos points to past delegations of power from the President

to agencies to support the argument that if a President was delegating his power, he would do so explicitly. *Id.* For example, Danos points to President Jimmy Carter's Executive Order delegating portions of the OCSLA Amendments of 1978 to various Secretaries. Dkt. 23 at 4, Ex. 23. Danos also argues that the MMS projections were only developed to aid with administrative functions, such as to aid the Secretary to consider states' requests for offshore leasing, and are not boundaries for purposes of § 1333(a)(2)(A). Dkt. 23 at 1–2. BP responds that the MMS notice does not say either way whether it was issuing the projected boundaries per OCSLA, nor was it under any obligation to make such a statement. Dkt. 25 at 2. Danos further asserts that Congress has rejected attempts in its last three sessions to amend § 1333(a)(2)(A) to adopt the MMS administrative boundaries as the §1333(a)(2)(A) boundaries, which would not be necessary if BP's position that the President had acted were correct. Dkt. 23 at 1.

Based on the evidence presented, the court is not persuaded that 2006 MMS administrative boundaries fulfilled the President's duty to draw boundaries under OCSLA. First, BP does not provide the court with legal authority to directly support its argument that the President delegated his authority to draw boundaries under § 1333 (a)(2)(A). BP's arguments also were not ultimately persuasive, especially without any other examples of courts who have made such a finding. A reference to the hierarchical structure of the Executive Branch alone, is not persuasive that the President delegated his OCSLA boundary drawing duty under § 1333(a)(2)(A) to MMS. Dkt. 21 at 5. The fact that the MMS used the long-standing principle of equidistance, and that a Presidential committee in 1970 directed federal agencies to apply this principle in dealings with coastal states, also does not make it any more likely that the President delegated his OCSLA boundary drawing duty to MMS in 2006. Dkt. 21 at 6–7. Additionally, the history of the transition from MMS to BOEM, and the fact both agencies have used the same administrative boundaries that BP argues are

definitive on the issue, also does not make it more likely that the President delegated his OCSLA boundary drawing duty to MMS. Finally, though the Federal Register said the boundaries were to be used, in part, to assist in the "affected State" status under OCSLA generally, BP admits that the notice in the Federal Register of MMS's boundaries does not state that they were created "pursuant" to § 1333(a)(2)(A) or even for use with the adjacent state determination. Dkt. 25 at 2. Based on this, the court cannot find that the President has published boundaries under § 1333(a)(2)(A), and "[a]s long as the President fails to perform and publish the § 1333(a)(2)(A) calculations, we must . . . consider all evidence." *Snyder*, 208 F.3d at 525. Therefore, the court turns to the *Snyder* four factor analysis.

### C. Four factor analysis

#### 1. Geographic proximity

The parties agree that the Marlin is located closer to Louisiana than Alabama. Dkt. 20-1 at 16; Dkt. 21 at 11. Therefore, this factor weighs in favor of Louisiana as the Marlin's adjacent state.

#### 2. Prior court determinations

Danos presents three prior court cases to support its contention that this factor weighs in favor of Alabama being the adjacent state to the Marlin. BP's only objection to these cases is that they are not relevant because the President has already published boundaries, making the consideration of any factors unnecessary. Dkt. 21 at 15.

In *Snyder Oil Corp. v. Samedan Oil Corp.*, the court considered whether the adjacent state of the Main Pass Block 261 was Louisiana or Alabama. 208 F.3d 521 (5th Cir. 2000); Dkt. 20-1 at 8, Ex. 5. The relevance of this opinion is that Main Pass Block 261 is located near Viosca Knoll Block 915 in a northwestern direction, approximately five blocks north and three blocks west. Dkt. 20-1 at 7; Ex. 5 (see Main Pass Block 261 in blue and Viosca Knoll Block 915 in yellow). The court

considered the following evidence: 1) that the platform was six miles closer to Louisiana than Alabama; 2) that federal agencies MMS and NOAA considered the platform to be off the coast of Alabama; and 3) that if the Mississippi/Alabama border was extended either due south or in the natural southeasterly direction of the common boundary, the platform would be in Alabama waters. Dkt. 20-1 at 8. The court determined that Main Pass Block 261 was adjacent to Alabama. *Id.*

In *Brown v. Total E&P USA, Inc*., the court considered whether the adjacent state of Viosca Knoll Block 823 was Louisiana or Alabama. No. 07-8133, 2008 WL 4724309 (E.D. La. Oct. 24, 2008); Dkt. 20-1 at 8. The relevance of this opinion is that Viosca Knoll Block 823 is located near Viosca Knoll 915 in a northwestern direction, approximately two blocks north and four blocks west. Dkt. 20-1 at 7; Ex. 5 (see Viosca Knoll Block 823 in green and Viosca Knoll Block 915 in yellow). The parties presented evidence within the four categories outlined by the *Snyder* court: 1) that the platform was geographically closer to the Louisiana coast; 2) that the platform was within the Alabama side of the projected state border based on the MMS's projections as part of its Coastal Zone Management Program; 3) several MMS documents that essentially stated that Viosca Knoll Block 823 platform was in Alabama waters; and 4) prior court determinations, some finding for Louisiana and some finding for Alabama. Dkt. 20-1 at Ex. 7 at 4–5; Ex. 8 at 7. The court determined that the Viosca Knoll Block 823 was adjacent to Alabama. Dkt. 20-1 at 9, Ex. 6.

In *Texaco Exploration & Prod., Inc. v. Amclyde Engineered Prods., et al.*, the court considered whether the adjacent state of Viosca Knoll 786 was Louisiana or Alabama. Nos. 99-3623, 99-3646, 00-0813, 2008 WL 782818 (E.D. La. Mar. 20, 2008); Dkt. 20-1 at 10. The relevance of this opinion is that Viosca Knoll Block 786 is located near Viosca Knoll Block 915 in a northeastern direction, approximately two blocks north and four blocks west of the Viosca Knoll Block 915, where the Marlin is located. Dkt. 20-1 at 7; Ex. 5 (see Viosca Knoll Block 786 in orange

and Viosca Knoll Block 915 in yellow). The court determined that the Viosca Knoll Block 786 was adjacent to Alabama. Dkt. 20-1 at Ex. 12.

Danos has provided three prior courts that determined that Alabama law, not Louisiana law, applied to the platforms in the vicinity of Viosca Knoll Block 915 and the Marlin. Two of the blocks found to be adjacent to Alabama were located more west of Alabama than Viosca Knoll Block 915. *See* Dkt. 20-1 at Ex. 5. BP's only objection to these court determinations is that they were not relevant because the causes of action accrued before the 2006 MMS publication, when it argues the President determined boundaries under § 1333(a)(2)(A), and which renders any *Snyder* analysis irrelevant. Dkt. 21 at 15. The court has already determined that this argument is unavailing in Section III.A, and therefore this objection is also unavailing. Under *Snyder*, these prior court determinations are relevant. This factor weighs in favor of Alabama as the Marlin's adjacent state.

### 3. Federal Agency Determinations

The parties submitted the following evidence to show that federal agencies determine either Alabama or Louisiana to be the adjacent state for where the Marlin is located.

Danos submits an MMS notice to pipeline right-of-way holders in the OCS showing that Alabama is be an "affected state" with respect to Viosca Knoll 915.[7] Dkt. 20-1 at 11, Ex. 13 at 6. Danos also contends that MMS lists Alabama as an "affected state" under its Coastal Zone Management Program.[8] *Id.* Further, Danos submits evidence that the United States Coast Guard, a part of the Department of Homeland Security, considers the waters around the Marlin to be a part

---

[7]The court takes note that the map under BOEM, the successor of MMS, still lists Viosca Knoll 915 as solely in the Alabama Coastal Zone Management. *See* "ROW Pipeline Map for CZM" at http://www.boem.gov/ROW-Pipeline-Map-for-CZM/.

[8]The court takes note that the map under BOEM, the successor of MMS, still lists Viosca Knoll 915 as solely in the Alabama Coastal Zone Management. *See* "OCS Plans Map for CZM" at http://www.boem.gov/Coastal-Zone-Management-Act/.

of Alabama. Dkt. 20-1 at 12. Specifically, Danos provides a map of the Coast Guard's various sector boundaries, which show that the Marlin falls in the Mobile, Alabama sector, not the New Orleans, Louisiana sector. Dkt. 20-1 at 13, Ex. 17. BP challenges the meaningfulness of this evidence because the Coast Guard falls under the Department of Homeland security, which means it does not deal with oil and gas leasing. Dkt. 21 at 13. Further, because the Coast Guard does not provide a sector for Mississippi, BP argues that utilizing such boundaries would be inequitable. *Id.* at 12.

BP provides evidence that the MMS and BOEM's administrative boundaries, first published in 2006, and Danos's own depiction of them in its own Exhibit 17, clearly show that MMS and BOEM designate Louisiana as the adjacent state to the Marlin. Dkts. 21 at 7–8, 12; 21-1 at 6; 20-1 at Ex. 17. Danos points out that the purpose of the MMS boundaries is administrative only, used for internal planning and coordination. Dkt. 23 at 2.

BP also points to Danos' Exhibit 21, a document submitted to MMS to acquire leasehold rights to Viosca Knoll Block 915. Dkt. 20-1 at Ex. 21. This document states that the company seeks to lease an area within Viosca Knoll Block 915, which is located in "Offshore, Louisiana." *Id.* BP argues that because the operations would be based out of Louisiana and a proposed public notice of federal consistency review would be held with Louisiana's Coastal Resources Program, this also supports Louisiana being the adjacent state. *Id.* at 14. Danos responds that Defendant's use of the requests to the MMS for leasing does not speak to MMS' determination, and is an improper argument because BP has argued that argued MMS says Alabama is the adjacent state to the Viosca Knoll Block 915 in the past. Dkt. 23 at 4. Further, the application also references that the lease is for "Offshore, Alabama," and it provides that the proposed lease complies with Alabama's approved Coastal Management Program in addition to Louisiana's program (Dkt. 20-1 at Ex. 21 at 16). *Id.*

Finally, Danos explains that the reason the operations would be based out of Louisiana is because the size of the industry in Louisiana is larger than Alabama's.

Finally, BP argues that the U.S. Energy Information Administration ("EIA") coded the Viosca Knoll Block 915 as Louisiana in its annual oil and gas field code master list, in its job of collecting, analyzing and disseminating independent and impartial energy information to aid in policymaking. *Id.*

Agency determinations are relevant in the adjacent state analysis because agency "determinations of projected boundaries, or other determinations of a similar nature, make it more probable that if the President does ever 'project boundaries' those boundaries will be consistent with these other agency determinations." *Snyder*, 208 F.3d at 525. Additionally, amongst multiple agency determinations, one agency's determination may be more probative than another if it is believed that the agency more closely followed the dictates of § 1333(a)(2)(A). *Snyder*, 208 F.3d at 525. Under 1333(a)(2)(A), the President must draw boundaries that extend from a state's boundaries seaward to the outer margin of the OCS. 43 § 1333(a)(2)(A). Here, each party submits evidence of determinations from MMS and other federal agencies, requiring the court to consider the relative probative value of each determination.

BP's evidence of the lease request was written by a private party requesting the lease and not the MMS. Further, it contains a similar number of supportive references to both Alabama and Louisiana. It is not clear that this evidence is even an agency determination, or that any determinations referenced support a finding that Louisiana is the adjacent state.

BP's evidence of the EIA determination weighs in favor of Louisiana as the adjacent state in that the EIA only associates Viosca Knoll 915 with Louisiana, and not with Alabama. However, it is less probative than other evidence submitted because it is unclear how the EIA determines this

block's association, even after a review of the cited online sources, which would provide perspective as to how closely the determinations followed the requirements the President must follow under § 1333(a)(2)(A).

BP submits the BOEM Outer Continental Shelf Boundaries, the boundaries developed in 2006 and which were published in the Federal Register.[9] Dkt. 21-1 at Ex. B. In terms of whether these boundaries follow the dictates of § 1333(a)(2)(A), the lines drawn in this map do appear to extend seaward from each state's borders. The lines do not completely follow the statute, however, because the state's borders do not extend to the outer margin of the OCS, as Mississippi's boundary and Alabama's boundary stop short of the OCS. The court also notes that the Viosca Knoll Block 915 is very close to this boundary between Louisiana and Alabama, less than two blocks in a diagonal line, and less than four blocks south of the line, demonstrating a smaller differentiation between the Alabama and Louisiana borders than the following two agency determinations.

Danos submitted evidence that the MMS designates affected states for pipeline right of way applications, and MMS says that the Viosca Knoll Block 915's affected state is Alabama. The court takes note of BOEM's current online maps that plot the affected states for each block to determine the relative probative value of the evidence based on whether the lines were drawn closely following § 1333(a)(2)(A).[10] These areas extend outward from the state boundaries to the OCS, except for the Alabama area. Further, there are areas of overlap between Louisiana, Mississippi, Alabama and Florida, which means these lines do not always differentiate one state's area from another, which

---

[9] BP suggests throughout its motions that because the BOEM administrative boundaries follow the principle of equidistance, they are more probative than anything else. However, regardless of whether the President might use the principle of equidistance if he ever does draw official boundaries, OCSLA makes no mention of equidistance and only requires that the lines extend seaward to the outer margin of the Outer Continental Shelf. 43 U.S.C. § 1333(a)(2)(A).

[10] The maps are available at this website: http://www.boem.gov/Coastal-Zone-Management-Act/.

seems less consistent with the requirements in § 1333(a)(2)(A), should the President ever draw boundaries. Despite the overlap in some areas of the map amongst the states, there is no overlap of boundaries on the Viosca Knoll 915, which is only assigned to Alabama. Further, in this designation, the Viosca Knoll 915 is eight blocks east of the Louisiana zone, which indicates a larger delineation between the waters in which the block resides than that of the MMS boundary cited by BP.

Danos also points to MMS's planning area for coastal zone management designation where the Viosca Knoll Block 915's affected state is Alabama. The court takes note of BOEM's current online maps that plot the affected states for each block to determine the relative probative value of the evidence based on whether the lines were drawn closely following § 1333(a)(2)(A). In terms of whether these boundaries follow the dictates of OCSLA, these boundaries do extend seaward from each state's borders all the way to the OCS.[11] However, there is overlap amongst Louisiana and Mississippi and Mississippi and Florida, which is not consistent with a boundary that would differentiate between which state's law would apply. Despite the overlap of some areas amongst states, here too, the only affected state shown for Viosca Knoll Block 915 is Alabama. Further, in this designation, the Viosca Knoll Block 915 is also eight blocks east of the Louisiana zone, not a few, as in the BOEM administrative boundary, which indicates a larger delineation between the waters in which the block resides than that of the MMS boundary cited by BP.

Finally, Danos' evidence of the Coast Guard's safety sectors does extend those borders out to the OCS, but it does not provide boundaries extending from each state, such as Mississippi. Therefore, it too does not completely follow the dictates of § 1333(a)(2)(A).

---

[11] The Viosca Knoll 915's "affected state" status is visible in context in this map: http://www.boem.gov/OCS-Plans-Map-for-CZM/.

None of this evidence appears to completely follow the dictates of § 1333(a)(2)(A), but some follows the dictates to an extent. Though a close determination, the court finds that the federal agency determination factor weigh in favor of Alabama being the adjacent state, as BOEM has found that Alabama is the sole affected state for Coastal Zone Management Planning and for right of way pipeline applications. Further the determination is more definitive between Louisiana and Alabama based on distance from the border in Danos' evidence than it is in the administrative border that BP cites. This factor weighs in favor of Alabama as the Marlin's adjacent state.

### 4. Projected boundaries

OCSLA explains that the boundaries to be developed by the President should extend state boundaries seaward to the outer margin of the OCS. 43 U.S.C. § 1333(a)(2)(A).

Danos argues that a seaward extension of the Mississippi/Alabama border results in Alabama as the adjacent state to the Marlin. Dkt. 20-1 at 14. Danos submits the expert testimony of a surveyor from the *Snyder* case, who projected boundaries and determined that the adjacent state to Main Pass Block 261 under OCSLA is Alabama. *Id.*; *Snyder*, 208 F.3d at 528. Danos proves up this expertise, which was also recognized in *Snyder*, in Exhibit 19. Specifically, in *Snyder* the expert found that if the Mississippi/Alabama boundary is extended seaward through the OCS in a true south or southeasterly extension, Main Pass Block 261 would be east of this boundary. *Id.* Danos uses the same projected boundary, and the fact that Main Pass Block 261 is more west than Viosca Knoll Block 915, yet still adjacent to Alabama, to claim that the Marlin is also adjacent to Alabama. *See* Dkt. 20-1 at Ex. 5 (see Main Pass Block 261 in blue and Viosca Knoll Block 915 in yellow).

Danos also submits evidence of the same surveyor's opinion from another case where the law of the adjacent state under OCSLA was at issue as to Viosca Knoll 915 itself. Dkt. 20-1 at 15. The surveyor found that using a lateral seaward extension of a boundary, Alabama would be the adjacent

state to Viosca Knoll Block 915. *Id.* At the same time, the surveyor also provided his opinion that Alabama would be the adjacent state to a platform located in Viosca Knoll Blocks 956 and 957. *Id.* Danos argues that if these blocks, which are slightly east and just south of the location of Viosca Knoll Block 915 are in Alabama waters, then Bock 915 should be considered adjacent to Alabama as well. *See* Dkt. 20-1 at Ex. 5 (see Viosca Knoll Block 956 in pink and Viosca Knoll Block 915 in yellow).

Danos also points to a chart from the *Brown v. Total E&P USA, Inc.* case, Exhibit 10, which shows a due south drawn line from Alabama to the OCS that is west of Viosca Knoll Block 823. Dkt. 20-1 at 15, Ex. 10. BP disputes the use of this chart because it is not clear what the purpose of the chart was in that case, and the line does not follow the principle of equidistance by only featuring a due south boundary line. Dkt. 21 at 16.

BP submits the BOEM administrative boundaries, as shown in Danos' Exhibit 17, and the fact that Viosca Knoll Block 915 falls to the west of the line, to show that Louisiana is the adjacent state to the Marlin. Dkt. 21 at 16–18. BP argues that the Fifth Circuit has blessed the use of equidistance to project boundaries, as set forth by the Supreme Court in *Texas v. Louisiana*, and therefore, any use of straight lines should be disregarded. 426 U.S. 465, 96 S. Ct. 2155 (1975); Dkt. 21 at 17.

Both parties have provided this court with evidence to support their positions. Danos has provided three expert opinions that support its position and a chart from a prior case, and BP has provided boundaries developed by MMS, and now BOEM, for administrative purposes.

At the outset, the court notes that a chart from a prior case, without more context as to what the chart represents, has less probative value than the other more specific evidence.

A key distinction between the evidence presented by each party is that Danos' three expert opinions look at specific blocks to determine the adjacent state under § 1333(a)(2)(A). BP's evidence is an administrative boundary that was not developed to determine the adjacent state under § 1333(a)(2)(A), at least as far as the purpose stated in the federal register in development of the administrative boundaries shows. Therefore, Danos' evidence is more specifically tailored to the question at hand, the adjacent state under OCSLA. This factor weighs in favor of Alabama as the Marlin's adjacent state.

### D. Conclusion

The first factor of proximity weighs in favor of Louisiana being the adjacent state to the Marlin. The other three factors weigh in favor of Alabama being the adjacent state to the Marlin. The court concludes that Alabama is the adjacent state to Viosca Knoll Block 915 and the Marlin. To the extent that there are gaps in federal law as applied in this case, Alabama law will govern. Therefore, BP's motion for summary judgment (Dkt. 22) is denied.

### IV. IS THE MSC ENFORCEABLE?

The parties have agreed that OCSLA governs its dispute, that federal law applies, and the law of the adjacent state provides the law where the federal law has gaps. This court has determined that, under OCLSA, the adjacent state to the Marlin is Alabama. *See* Section III.

Danos argues that "[u]nder Alabama law, contractual indemnity provisions, even those providing indemnity for the indemnittee's own negligence, are enforceable." Dkt. 20-1 at 17. Danos argues that the indemnity provisions of the MSC are enforceable. *Id.* They are express, and in clear and unequivocal language. *Id.* Danos claims that BP and Danos knowingly, fairly, willingly and intelligently entered into the MSC and for valid consideration. *Id.*

The MSC at issue was provided as an exhibit to Danos' motion at Exhibit 3. The indemnity section spans five pages and contains a specific provision relating to the Company's (BP's) General Indemnity Obligations. Dkt. 20-1 at Ex. 3 at 11. In particular, the indemnity portion of the MSC provides that the "Company shall indemnify the contractor group [Danos] from and against all claims/losses for the following when Connected With this Contract: (I) all injuries, deaths, or illnesses of persons in the Company Group, and (ii) all damages to or losses of Existing Property in excess of [$250,000] per occurrence, even if caused by the Negligence/Fault of Contractor Group or any other person . . . . Dkt. 20-1 at Ex. 3 at 11 (outlining section 14.03.01 of the contract).

In the face of this motion for summary judgment, though BP provided evidence on the matter of the "adjacent state," it did not dispute Danos' position that under Alabama law, the MSC and its indemnity provisions valid and enforceable. Federal Rules of Civil Procedure Rule 56(e) explains that "[i]f a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may" take several steps, including consider the fact undisputed for purposes of the motion. Fed R. Civ. P. 56(e).

Based on this, the court considers that it is undisputed bewteen the parties that if Alabama law applies, which this court has determined it does in Section III, the MSC's indemnity provision cited by Danos is valid and enforceable. More specifically, it is undisputed that the contract was entered into knowingly, fairly and intelligently, that consideration was paid, and that the coverage of negligence is clear and unequivocal. Based on the court's own reading of the MSC, many clauses in the indemnity section state clearly, and with underlining, that the provisions cover negligence. The specific provision argued applicable by Danos, 14.03.01, is also outlined. The court finds that the indemnity section of the contract meets the requirements under Alabama law, and this indemnity provision is valid and enforceable under Alabama law.

For these reasons, Danos's partial motion for summary judgment (Dkt. 20) is granted.

## I. CONCLUSION

For the foregoing reasons, Danos' partial motion for summary judgment (Dkt. 20) is **GRANTED**, and BP's motion for summary judgment (Dkt. 22) is **DENIED**.

It is so **ORDERED**.

Signed at Houston, Texas on November 19, 2014.

_____
Gray H. Miller
United States District Judge